Turn next to United States v. Coleman You may begin whenever you're ready. Thank you, Your Honors. May it please the Court, my name is Nancy Talner. I'm representing appellant Sadie Coleman. I'd like to reserve five minutes for rebuttal. We've raised several issues in the brief, but given limited time, I'm going to try and discuss two of them. But we're certainly asking the Court to consider all the issues in the brief. The two issues that I did want to discuss this morning were the search and suppression issue that involves a so-called protective sweep that we believe the police exceeded the scope of that and then improperly used it in the search warrant that produced significant amount of evidence that was used at the trial. The other issue that we'd like to address is the sophisticated means enhancement that was used to add two points to Ms. Coleman's sentence. We believe that enhancement was improperly applied here. Regarding the search issue, when the police went to arrest Ms. Coleman, they had an arrest warrant, but everyone agrees, all the parties agree, that they did not have a search warrant. In fact, the record in this case, unlike most of the other independent source cases, shows that the police had specifically not decided to get a search warrant when they went to serve the arrest warrant. Counsel, here's the problem that I have with your argument on this point. And again, just speaking only for myself, but maybe you can help me with this. It seems to me that even if the evidence regarding the citing of the envelopes on the kitchen table were excised from the affidavit in support of the search warrant, it seems to me there was plenty else going on here. For example, she gave them a brand new piece of false identification when they arrested her. So it seems to me that it just is awash, that why does it make any difference? Well, Your Honor, what we've argued in the briefs and what we would ask the Court to consider, and again, and this is the distinction from the independent source cases, is that that was a factual question. Under the Murray case, the Neuspar case, the cases cited by the government, Salas and Bossio from this Court, the issue of whether that might have affected the magistrate's decision to issue the warrant is a factual question. But the ---- It seems almost impossible that it would have, because there was so little information gleaned from those envelopes, just other than that she was there, which they already knew. Well, Your Honor, we would submit that there was a legitimate factual question that suffice to have required holding an evidentiary hearing, which the district court did not do. The problem was that ---- Wasn't the test that if you excise from the warrant, from the affidavit, the allegedly offensive information, is there facially enough left to justify the issuance of the warrant? Your Honor, we would submit under the Neuspar case that that was not sufficient in that case. Is that the test? Well, Your Honor, we submit it's not the test. What's the test? That the test is whether the improperly obtained information might have affected the warrant, and that that's a factual question that required an evidentiary hearing. After such a hearing, the Court might have found it's a fact that it was, in fact, and that the warrant was, in fact, from an independent source, applying Murray and Segura and the proper Neuspar test. But I think it's not proper for the ---- Was there a pro for a fax to the judge and ask for a hearing? What are the facts that you would say are in dispute that have to be decided? Yes, Your Honor. In the trial counsel's, defense counsel's suppression motion, they did assert that the finding the mail, which then they used in the search warrant to show that this was her residence, that that did influence the decision to seek the search warrant, at least was part of what established probable cause. The probable cause determination rested on this being her residence, and the mail was used to show that. What else was in the affidavit? There was other information in the affidavit about their investigation, what they had done that established probable cause for arrest. Weren't those facts more enough to carry the search warrant if you exclude finding the envelopes? Your Honor, again, I think we submit that under Neuspar and Murray, that's not the ---- that's not sufficient to be the test if there hasn't been an evidentiary hearing to determine the facts. Defense counsel's ---- So in any case in which there's a claim that improper information is included in the affidavit, you have to have an evidentiary hearing? Is that what you're suggesting? Well, Your Honor, I don't think we need to go quite that far, Your Honor, but I think that the question ---- Or you draw the line. Well, I think the question comes down to the Wong-Sun test also, which is part of this, which is whether there was an exploitation of the illegality, whether there was a taint. And that, like we said, is a factual question. In this case, I think the warrant affidavit shows that there was enough to make it enough of a factual question for a hearing, given that they were using seeing the mail there to show that this was her residence and that was part of the probable cause. Your theory, if there's improper evidence in the affidavit, there would always be an exploitation of the taint, wouldn't there? Well, no, Your Honor. I believe Murray and Segura are perfect examples of when that's not true, because in those cases, the record showed that the police had already decided to obtain the search warrant before they did the illegal conduct. That's an important distinction from this case, where the government admits they had not made that decision before the illegal conduct. And then the second fact we have in this case that distinguishes it from just any sort of use, any sort of reference whatsoever, is that it did play an important part in the reasoning of the affidavit that showed this was where she lived and ruled out where someone else lived. But even on that point, the affidavit in paragraph 20 recites other information showing that this was her residence, including visual surveillance and the fact that she was found there at the time of her arrest. So, again, even just looking at the issue of her residency, I just don't see that it would make any difference at all. Well, Your Honor, I agree there was other information asserted there, but I also think that because of that whole discussion in that part of the warrant affidavit, it showed why this was a factual question. The government was allowed to make its assertions regarding the facts, but the evidentiary hearing and show why there might have actually been a taint here. That's not the normal process for an application for a warrant, is it? I mean, the normal process is if there's an affidavit under oath and the magistrate looks at it. It's not a trial. No, certainly, Your Honor. But what we're saying in the case of support is that you then, when there's then a suppression motion brought in the – after the charge, that at that point there is a test for when you should have an evidentiary hearing. The test for having that hearing is whether you've put the facts in dispute. And what we're saying is defense counsel did do that. The trial court improperly interpreted the motion and the papers as having conceded somehow there was no factual issue. But all the cases say this was a factual issue and that there should have been an evidentiary hearing on the suppression motion at that point. As I take your argument, the mere fact that they found the envelopes on the kitchen table is so prejudicial to or overpowers any other outside evidence, and it will always be tainted, and no matter how you find out her residency, the mail on the table found during the arrest is going to taint that – any attempt to get a search warrant later. Well, again, I don't think it's as broad as that's going to be true in every case. It is a fact-specific inquiry. I'm talking about this case. Yes. And in this case, combined with the fact that the police hadn't wanted to get a warrant – a search warrant beforehand, then they do the illegal sweep, which we've set out in brief why this was – this was not a sweep for persons. It was looking at something that's fairly intrusive, which is looking at someone's that when you combine that with then doing the search warrant application and using as the first point in why this is where we know where she lives, that we saw this mail on the table, and then going on to talk about the other information, that when you put all those facts together, it was enough to at least have an evidentiary hearing, if not to outright suppress it. The Court doesn't have to go as far as saying this would always be enough to grant suppression. What we are asking the Court to do is say that it was enough for the threshold determination of an evidentiary hearing, and that did occur. In other words, you want the officers, the people that prepared or gathered the information for the arrest warrant – or the search warrant affidavit under oath, and you want to cross-examine them as to their mental process and the whole thing, right? Yes, Your Honor. And, in fact, the government at the trial level did submit a declaration from the officer, which we think shows this was a factual issue. He was trying to assert this was what my thought process was. Well, that opens the door to the defense having a hearing and being able to show that was not what the thought process was. And beyond that, Your Honor, I think some of the cases, the independent source cases are also revealing and show why this is distinguishable, in that in those cases they didn't even mention in the search warrant affidavit the illegal entry that had occurred. In those cases, it was easy for the courts to say, this warrant is wholly independent. It's from a clearly independent source. It was not tainted under Wong-Sun test. That's not what occurred here. And, again, that doesn't even need to be the sole determination. There were other reasons here why it was a fact issue. I will just briefly mention, Your Honors, on the sophistication enhancement in the sentencing. The main thrust of our argument here is that Ms. Coleman's sentence was already enhanced for numerous other reasons. She got four points for being a leader organizer, two points for more than minimal planning. There were significant enhancements for the amount of loss and possession of over five means of identification. The trial court simply went too far when it tried to stretch the sophisticated means guideline enhancement to fit this case. There was nothing particularly sophisticated about the conduct here. This was, yes, it lasted a long time. Yes, it involved a lot of different kinds of conduct. But the guideline requires something very specific. It requires an unusual degree of sophistication, unusual complexity or intricacy. We read about identity thefts all the time, identity theft cases all the time. There was just nothing that rose to that level of unusual complexity or sophistication here. So I'd, having said that, reserve the rest of the time for rebuttal. You may do that. We'll hear from the government. May it please the Court. My name is Andrew Friedman, and I represent the United States in this case. Can I ask you a question? I have a list here of the things that are in the search warrant affidavit besides the fact that the mail was found on the table. And check this if I'm wrong, that the U.S. Postal Service informed law enforcement that the defendant received mail at that address, that the Washington State Department of Social and Health Service informed law enforcement that the defendant had verified the part where she lived at that address, and that the surveillance suggested by her car parked there that she was there. Now, were those facts certified to found after they saw the mail on the table? No, Your Honor. This is not really in the record. The inference the Court could make from the record is that the arrest warrant was obtained the day before. The arrest took place at 8 a.m. that morning, roughly. The search warrant is obtained within a couple hours of that. So obviously, there's been a fair amount of investigation. Most of those facts are things that were known before. They went to the arrest because they knew that this was they knew where she was. Correct. Surveillance being one of them. Correct. So all of those facts were known. And given that the search warrant is obtained almost immediately after the arrest, obviously, the government wasn't doing a lot of new investigation. There wasn't time to do new investigation to learn those facts. The affidavit recites the dates of the surveillance, and they were earlier than the date of the arrest. Correct. So the surveillance is all earlier. Obviously, the arrest takes place before the protective suite, but a few minutes before it. So those facts had to have been known before. And the other facts, there wouldn't, as a practical matter, have been time to develop them. It's not in the record, but I would represent to the Court that they were known before. Because obviously, you can't, between the time they saw the mail on the table and they got the search warrant, which was almost immediately after that, they didn't have time to do the postal service and the social services people. I think that's a fair inference. And as the Court has also pointed out, the surveillance had been conducted over the course of the previous week or two, and the arrest had taken place prior to the sweep. So there is plenty of evidence there. The other important thing is the only thing about the mail is the mail, this is not mail that's evidence of fraud, evidence of crime, mail in fake names. It's mail addressed to Ms. Coleman in her name on her kitchen table. I see the mail just laying there. Addressed to her in her own true name. At that address. Correct. So the only value that it has at all is not as an indication of fraud or anything, but as an indication that she lives here, which is already clearly established by the fact that she's arrested there. Surveillance has shown her there. And the postal service has said she receives mail there. Once they say that, finding a letter is what you would expect. It adds nothing to it. On the search, I'd add one other point, which is under Murray, which we've cited, it's a two-pronged test of whether the supposed illegality tainted the warrant. The first is the question of whether some fact that's been learned has contributed to the issuance of the warrant. And that's the argument that we've had all along here,  but for the finding of the mail, the warrant would not be issued. That's not a factual question that should lead to a hearing. As the Court noted, the question is the standard is whether the warrant, when that information is excised, is sufficient to support a finding of probable cause and therefore to support the magistrate's issuance. So that wouldn't require a hearing. The only way you would have a factual question in a hearing would be if the Court found that this was the critical evidence and then you would presumably have a factual hearing on whether what actually happened was a legitimate protective sweep or not. That would be a factual question that might justify a hearing. But in this case, and the government would contend that it was a legitimate protective sweep and that the affidavit supports that, but I would understand that that would be an appropriate situation for a hearing. Here, where the question is, if you excised it, do you still have probable cause? No hearing. The mail was picked up later and opened, right? I don't believe it was. Okay. It's mail addressed to her, so it wasn't evidence of anything and was not taken in the sweep, I don't believe. So the second thing I said is it's a two-prong test. The second thing is whether the decision to seek the warrant is a result of the supposedly improperly obtained information. So if an officer were to see the mail and the fact that he saw the mail is what leads him to seek the warrant. I have not taken the defendant's argument to be that. That's what I was going to say, Your Honor. The argument, I have not understood her to be making that. That argument's never made until the reply brief, and that was going to be my point. It was not made in the trial court. It was not made, I don't believe, in the opening brief. It is made in the reply brief, but the government believes that it's waived. In addition, Agent Velling's affidavit specifically rebutts that. So the only evidence is that there was no – that that was not what motivated the search. The second question I'd like to address for you. Let me stop you just there just for a second. I wanted to check and make sure I'm correct. From the time that the officers during the arrest process saw the mail on the kitchen table, what time lasts before the search warrant was served? I would have to look at the time on the search warrant, Your Honor. But I would guess an hour, an hour to two hours. So in that hour or two hours, either the search warrant affidavit, which is extensive, I'm looking through it now, is either prepared in advance or was rushed and prepared with all that fact in it. Within the hour, it was prepared, brought over, and served. And a judge signed off. Yes. Again, Your Honor, if you compare the search warrant affidavit to the complaint, you'll see that most of it is really the complaint. There are, I think, four or five new paragraphs at the end. So those were added. In any case, it had to be prepared or was prepared in advance, and that information was somewhere in that hour, judge, preparation, service, delivery, et cetera. That was all done in that brief space of time, Your Honor. And, again, it's not in the record, but I would, I mean, I think the Court can infer that that couldn't have been done from scratch in that time. I was just looking at the detail. That's why I was wondering what the time frame was. Thank you. Okay. The second question I'd address very briefly is the question of the multiple conspiracy instruction. And the reason for that is because the reply brief, I think, makes a slightly different argument than the government understood defendants would have been making in the trial court and in the opening brief. Defendants sought at trial an instruction on multiple conspiracy. The government has always understood that the argument was that Coleman, some of Coleman's co-conspirators may have conspired separately, and so there was, there may have been a conspiracy involving Coleman, separate conspiracies involving the co-conspirators. There was no, in our brief, we laid out basically a detailed refutation of that. There was no evidence to support that, and so the district court did not abuse its discretion in denying that instruction. The reply brief says the government has misconstrued the defendant's argument and that the argument was that some of the co-conspirators conspired with other people to do other things, and those are the multiple conspiracies. And, again, the district court did not abuse its discretion in denying an instruction if that was the theory. I think that's, I have not understood that to be the theory, so I'd argue it's waived. But if it was, it would not support the instruction because whatever this conduct was was entirely unrelated to the conduct at trial. There's really two examples the defense cites. One is an episode in which Darnisha Moody, a co-conspirator, stole someone's purse at an airport a number of years ago. She did that with her sister. She admitted that on the stand. It has nothing to do with the conduct at issue in this trial. It has nothing to do with the crimes with which Coleman was charged. The other incident is similarly removed from the conduct here. So the conduct here, what the court was, what the jury was being asked to look at and decide whether Coleman had conspired to do was entirely unrelated to this other conduct. There's no reason to give a multiple conspiracy instruction based on those other episodes. Finally, on sophisticated means, the standard of review is whether the district court clearly erred. It's a factual finding. And the record, on the record in this case, it's clear that that finding was appropriate. The district court did not commit clear error. The best evidence of that is really what was found in the search of Coleman's house. When the officers searched the house, they found basically everything you need. It's a sophisticated identity theft factory. She had all of the documents you need, all of the things you need to conduct identity theft in a very sophisticated way. First, to steal people's identities. Second, to use that to commit fraud. In terms of stealing identities, she had everything from blank birth certificates, blank marriage certificates, blank W-2s. Then there were partially completed documents of these various types, which showed that what she did was she would establish an identity. She'd start off with typically nongovernment-issued documents, so create maybe an identity card for a job with a private employer and maybe get a college ID. Then go to Oregon in order to get a State-issued driver's license or an identification card. The reason for that shows the sophistication. The Guidelines actually talk specifically about locating or using things out of jurisdiction being evidence that something deserves sophisticated means. The reason Coleman went to Oregon, it's a three-hour drive down, a three-hour drive back, so she's devoting a day to this. She's doing it again and again. The reason she's doing it is because she knows that it's easier to get ID in Oregon. Oregon only requires a middle initial so that you can wash identities and names and incorporate real people's names in by going through Oregon and just turning a last name to a middle initial and then recreating it as a different name, things you can't do in Washington. She then uses those to get Washington IDs. So it's a very complicated, sophisticated process that she's doing specifically to take advantage of this other jurisdiction, to take advantage of what it offers. And she wouldn't be doing it because of all the effort involved if it weren't worth it. She then uses those to commit fraud in increasingly sophisticated ways. At the start of this, the early part of the fraud, she's doing very simple things of just appropriating someone else's ID, bouncing a few checks. By the end, she's developed a very sophisticated method in which she goes to two specific banks, opens accounts to each of them, puts $1,000 into each, and then has a method where she spends two days driving around, hitting bank after bank of one, writing checks on the other one in an amount slightly less than the deposited amount, knowing that there's a quick time lag. If people from one bank check with the other, they're going to be told there's money to cover these. She's making $20,000 per two-day run of this, doing it again and again, targeting exactly the banks that are weak to it and taking advantage of the specific weakness. So this is not garden variety identity theft. The Court, in applying the four-level enhancement, is not just saying this has gone on a long time. It's not double-counting that. It's looking at the fact that the way in which she's doing this is sophisticated, is designed to exploit weaknesses in the identity, the identification document issuance process and in the financial system. And so the government believes that that's an appropriate enhancement, too. If the Court has no further questions, I'll rest on the briefs. Thank you, Your Honor. And you have some rebuttal time remaining. Yes, Your Honors. Regarding the search issue, I just wanted to read a sentence from the Neuspar case. In that case, like here, there was a significant investigation prior to the police doing an improper sweep and then obtaining a search warrant. But in the Neuspar case, the Court says the agent sees nothing during the sweep but may have used information therefrom to obtain the search warrant, and then went on to say that the district court should determine the facts about whether the later seized documents were impermissible fruits of the sweep. So that's what we've submitted is the proper test. The Court should determine. It's not an evidentiary hearing, is it? That particular case did not discuss an evidentiary hearing, but the other cases that talk about the standard for that, we believe, show why there should have been a hearing in this case. And the Neuspar case, also the portion that I read, mentions nothing about simply excising anything from the sweep. In using the reasoning I just read, they couldn't have been saying that that was good enough. They did not approve that test, certainly. So we're submitting that the Neuspar test is the proper one. Regarding the government's allegation that somehow we've made inconsistent arguments about the search theory and raised some different theory in the reply brief, the theory throughout the trial court motions and on appeal has been the same. It's been that the improper sweep here did taint the search warrant and that that's why at least an evidentiary hearing should have been granted or suppression should have been granted. So I don't think it's an accurate characterization of the record to say that there was some theory raised at the last minute here. The same point regarding the multiple conspiracy instruction issue, the theory at the trial level and on appeal has been consistent. It's that these co-defendants did go out and do acts on their own, and the theory of the case that was submitted at the trial was. I don't see how that helps you because the mere fact that the co-conspirators were generally criminals doesn't really detract from the government's evidence or theory at all. One wouldn't expect her to conspire with people who were brand new to the world of crime. And so I guess I just don't see why it helps you. Well, Your Honor, the theory of the defense at the trial was that the government was alleging in the indictment that Ms. Coleman did all of the charged acts with these co-defendants. The defense theory was that the jury should not find that beyond a reasonable doubt because in fact the co-defendants were doing other things on their own and therefore may not have done these things with Ms. Coleman. That may go to a reasonable doubt, but if the fact that they did other acts not charged with other people, I don't see how that relates at all to who did the charged acts. Do you understand? I mean, I can see that it would be useful to raise a reasonable doubt, but I don't see why it would give rise to a multiple conspiracy instruction. Your Honor, I think what the trial attorney was saying is that his theory of the case was reasonable doubt, that in order to explain to the jury why there was reasonable doubt, he needed at least either a simple form or a longer form of the multiple conspiracy instruction to show the jury that if they found there was the variance that Claudiacos refers to, that they could then use that reasonable doubt to acquit the defendant. That's why the failure to give that instruction was prejudicial error. Your time has expired. Thank you, Your Honor. Thank you very much for your arguments on both sides. The case just argued is submitted.
judges: Brunetti, Tg Nelson, Graber